**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

TIMOTHY L. BROWN,

Plaintiff,

-against-

THE CITY OF NEW YORK; Detective VOLKAN MADEN, Tax Reg. No. 956863, Shield No. 05056; Detective MICHAEL P. ALGERIO, Tax Reg. No. 952394, Shield No. 01032; Sergeant JOHN DOE 1; Lieutenant RONALD J. REYNOLDS, Tax Reg. No. 937368; Captain DANIEL L. CASELLA, Tax Reg. No. 944025; and Police Officers JOHN and JANE DOES 2 through 10,

Defendants.

Civil Action No. 26-cv-7244

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Timothy L. Brown, by his attorneys, The Cochran Firm, alleges as follows:

## INTRODUCTION

1. On the afternoon of April 14, 2026, Timothy Brown, a 46-year-old home health aide, walked from his home on Hoyt Street in Brooklyn to a nearby liquor store to buy a bottle of wine. He had worked his shift that day. He had done nothing wrong. Minutes later he lay on the store's floor in broken glass and his own blood, his nose broken and his knee torn open, while two NYPD detectives knelt on him and cursed at the customers begging them to stop.

2. The detectives, Volkan Maden and Michael Algerio of the NYPD's Brooklyn North Narcotics unit, were looking for a man whom an undercover officer had described only as wearing a white shirt and green shorts. That was all they had. Mr. Brown was wearing a white T-shirt and teal shorts. Without asking him a single question, without checking with the undercover officer, and without any evidence tying him to a drug sale, they seized him.

3. A customer recorded what followed. Algerio threw punch after punch at Mr. Brown's head while he held his arms up to protect his face. The detectives drove him headfirst

into a wine display, shattering dozens of bottles. They dragged him by his ankles through the glass. Maden raised his leg high and brought his foot down on the back of Mr. Brown's thigh. For minutes, Algerio knelt on Mr. Brown's back with his hands at his head and neck, while Maden repeatedly stepped away to the door to type on his phone. Customers shouted, "Why are you punching him?" and "He's not resisting!" No officer intervened.

4. The detectives carried no radios and wore no body-worn cameras. While Mr. Brown bled on the floor, one of them shouted, "Where the fuck are these guys?" No other officer arrived for about seven minutes. When help finally came, one of the detectives stood outside the store and shouted, "And if these guys don't get a radio ASAP, I'm making a big fucking problem. I'm not doing this WhatsApp shit no more."

5. Mr. Brown had nothing to do with any drug sale. The detectives found no drugs, no money and no contraband on him. To justify what they had done, they charged him with resisting arrest and obstructing governmental administration. The Kings County District Attorney declined to prosecute, and the NYPD determined that Mr. Brown was not the man the officers were looking for.

6. Mr. Brown left the store in handcuffs and was taken to the hospital with a broken nose, a hematoma on his scalp and glass embedded in his knee. His wounds took 25 stitches to close. He walked with a cane for months, he has not been able to work since, and he now suffers from post-traumatic stress disorder.

7. What happened to Mr. Brown was the product of choices the City of New York made long before that afternoon. Maden and Algerio came to that store with records of civilian complaints, substantiated misconduct and lawsuits alleging force, and the City kept them on the street. Formal charges substantiated against Maden were never served on him. His repeated failures

to give civilians the identification the law requires went unpunished. The City sent narcotics teams into crowded neighborhoods without radios or cameras, coordinating arrests through WhatsApp and seizing people on nothing more than a description of their clothes. Within a week of the video becoming public, the NYPD disbanded the module, transferred its lieutenant and captain, and ordered a review of its narcotics enforcement, and the Police Commissioner later testified that the incident had raised serious concerns about supervision and compliance. Those measures came too late for Mr. Brown.

8. Mr. Brown brings this action under 42 U.S.C. § 1983, the New York City Administrative Code and New York law to hold the detectives, their supervisors and the City of New York accountable.

## JURISDICTION AND VENUE

9. This action arises under 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

10. The Court has supplemental jurisdiction over Plaintiff's claims under New York State law and the Administrative Code of the City of New York under 28 U.S.C. § 1367(a), because those claims arise from the same events and form part of the same case or controversy.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), because the events giving rise to the claims occurred in Kings County and the City of New York resides in this District.

## COMPLIANCE WITH THE GENERAL MUNICIPAL LAW

12. On April 27, 2026, within ninety days after the claims arose, Plaintiff served a Notice of Claim on the City of New York in compliance with General Municipal Law § 50-e by

personal delivery to the Office of the New York City Comptroller. On April 28, 2026, Plaintiff served an Amended Notice of Claim on the Comptroller in the same manner.

13. The Office of the New York City Comptroller acknowledged receipt of the claim on May 1, 2026, and assigned it Claim No. 2026PI013824.

14. Plaintiff appeared and was examined under General Municipal Law § 50-h on July 15, 2026.

15. More than thirty days have elapsed since service of the Notice of Claim, and the City has neither adjusted nor paid the claim.

16. This action is commenced within one year and ninety days after the events on which the claims are based, as required by General Municipal Law § 50-i.

## PARTIES

17. Plaintiff Timothy L. Brown is a resident of Kings County, New York, where he lives on Hoyt Street in Brooklyn. He has worked for many years in security and, from January 2024 until he was injured, worked as a home health aide for EvergreenChoice LLC, doing business as FreedomCare.

18. Defendant City of New York (the "City") is a municipal corporation organized under the laws of the State of New York. The City operates, manages and controls the New York City Police Department ("NYPD"), and is responsible for the NYPD's policies, practices and customs and for the hiring, training, equipping, supervision and discipline of its members. The City employed each individual defendant at all relevant times.

19. Defendant Detective Volkan Maden ("Maden") was at all relevant times an NYPD detective assigned to the Narcotics Borough Brooklyn North ("Brooklyn North Narcotics").

20. Defendant Detective Michael P. Algerio ("Algerio") was at all relevant times an NYPD detective assigned to Brooklyn North Narcotics. Maden and Algerio are referred to together as the "Detective Defendants."

21. Defendant Sergeant John Doe 1 ("Sergeant Doe") was at all relevant times the NYPD sergeant assigned to supervise the Detective Defendants during the operation described below. Plaintiff does not yet know his name. After the events described below, the NYPD placed him on modified duty and removed his supervisory duties.

22. Defendant Lieutenant Ronald J. Reynolds ("Reynolds") was at all relevant times, upon information and belief, a lieutenant assigned to Brooklyn North Narcotics who oversaw the module to which the Detective Defendants and Sergeant Doe were assigned.

23. Defendant Captain Daniel L. Casella ("Casella") was at all relevant times, upon information and belief, a captain assigned to Brooklyn North Narcotics who oversaw that module and its operations. Sergeant Doe, Reynolds and Casella are referred to together as the "Supervisory Defendants."

24. Defendants Police Officers John and Jane Does 2 through 10 are NYPD members, including undercover and supervisory personnel, who participated in planning, conducting, supervising or reporting on the operation and arrest described below, and whose names Plaintiff does not yet know. Plaintiff will amend this Complaint to name them when their identities are learned.

25. At all relevant times, each individual defendant acted under color of state law and within the scope of his or her employment by the City. Each individual defendant is sued in his or her individual capacity.

## FACTUAL ALLEGATIONS

**A. The April 14, 2026, Buy-and-Bust Operation**

26. On the afternoon of April 14, 2026, members of Brooklyn North Narcotics, including the Detective Defendants and Sergeant Doe, conducted an undercover "buy-and-bust" narcotics operation in the area of Hoyt Street and Baltic Street in Brooklyn.

27. Upon information and belief, Reynolds and Casella planned, approved and oversaw the operation, selected and assigned the personnel who conducted it, including the Detective Defendants, and were responsible for ensuring that the team was properly equipped and complied with NYPD policy, including the requirement that members wear and activate body-worn cameras during enforcement activity.

28. Upon information and belief, during the operation an undercover officer purchased crack cocaine from a man in the area, and NYPD members arrested a man for the sale.

29. According to the NYPD, the undercover officer described an alleged associate of the seller as a man wearing a white shirt and green shorts.

30. Plaintiff had nothing to do with any drug transaction. He was not present for the sale, had no contact with the seller, and possessed no drugs, money from any sale or other contraband.

31. Shortly before 4:00 p.m., Plaintiff, who had worked his shift as a home health aide earlier that day and had then gone home and changed his clothes, walked to BK Wine Depot, a liquor store at 214 Hoyt Street, at the corner of Baltic Street, a short walk from his home, to buy a bottle of wine. He was wearing a white T-shirt, teal shorts, a teal bucket hat and white sneakers.

32. Plaintiff held the door for two women entering the store and went to the back of the store to choose a bottle of wine.

33. As Plaintiff turned to walk to the counter to pay, the Detective Defendants approached him. They had no information connecting Plaintiff to the sale. Their only basis for approaching him was that his clothing fit a description of a white shirt and green shorts. Upon information and belief, that description included no height, build, age or other distinguishing feature, and it fit any number of people in the neighborhood that spring afternoon. Upon information and belief, the Detective Defendants never saw Plaintiff with the seller and made no effort to confirm the identification with the undercover officer, to observe Plaintiff's conduct, or to ask Plaintiff a single question before seizing him. Upon information and belief, the undercover officer never identified Plaintiff as a participant in any sale.

**B. The Seizure and Beating**

34. The store's surveillance cameras recorded Plaintiff entering the store and walking down an aisle before the Detective Defendants approached him. At least two customers recorded the encounter that followed on their phones, producing footage nearly eight minutes long. Figures 1 through 8 below are still images from one customer's recording, with the elapsed time in that recording shown in parentheses.

35. One of the men told Plaintiff he was under arrest. Plaintiff asked why. He does not recall either man giving any reason, and neither told Plaintiff he was a police officer. Algerio wore a black T-shirt, jeans and a black cap with no visible police insignia. Although Maden wore a navy tactical vest marked "POLICE," the Detective Defendants seized Plaintiff so suddenly and violently that he did not realize the men who grabbed him were police officers.

36. Before the customer's recording began, the Detective Defendants grabbed Plaintiff's arms and pulled him backward. Plaintiff said, in substance, "All right, all right," and told them he was not resisting.

37. Almost immediately, one of the Detective Defendants began punching Plaintiff in the head. A customer's phone recording of the encounter begins with a bystander shouting, "Why are you punching him?"

38. The Detective Defendants drove Plaintiff back against the glass wall beside the front door and pinned him there. Algerio gripped Plaintiff's head and neck, and Maden wrapped an arm around Plaintiff's head, knocking off his hat. As Plaintiff held his arms up around his head to shield himself, Algerio threw a rapid series of punches at his head and upper body.



**Figure 1 (0:07).** Algerio, at left, grips Plaintiff's head and neck while Maden, at right, pins Plaintiff against the glass wall. Plaintiff's hands are raised to his face.



**Figure 2 (0:09).** Algerio draws back his fist to punch Plaintiff, who is pinned against the glass wall with his arms raised around his head.

39. Algerio then locked an arm around Plaintiff's head and bent him over at the waist, and the Detective Defendants together drove Plaintiff headfirst into a round wine display, breaking dozens of glass wine bottles around him.

40. Plaintiff landed on his hands and knees in the broken glass. The Detective Defendants pulled him onto his back and dragged him by the ankles across the floor through the broken glass, first Maden and then Algerio, leaving his blood on the floor.



**Figure 3 (0:16).** The Detective Defendants drive Plaintiff headfirst into the wine display.




**Figure 4 (0:21).** Maden pulls Plaintiff by the ankle and Algerio by the arm as they drag him across the floor through broken glass.

41. The Detective Defendants then forced Plaintiff onto his stomach. While Maden held Plaintiff's wrists behind his back and Algerio knelt across his upper back, Maden raised his leg high and brought his foot down on the back of Plaintiff's thigh. Moments later Maden stood with his foot on Plaintiff's leg. For minutes afterward, Algerio knelt on Plaintiff's back with his hands at Plaintiff's head and neck, and at one point straddled Plaintiff's head with his shin. Plaintiff's face was covered in blood, blood dripped from his mouth, and a pool of blood formed on the floor around his leg.




**Figure 5 (0:35).** With Algerio kneeling on Plaintiff's back, Maden raises his leg high over Plaintiff before bringing his foot down on the back of Plaintiff's thigh.




**Figure 6 (4:12).** Algerio stands astride Plaintiff's head while Maden kneels on Plaintiff's legs and holds his wrists. Plaintiff's face is bloodied.

42. The Detective Defendants also kicked Plaintiff as he lay on the floor. Upon information and belief, after Plaintiff had been handcuffed, Algerio punched him in the face repeatedly.

43. While pinned to the floor, Plaintiff told the Detective Defendants that he had a security license in his pocket. He cried out in pain from the injury to his leg. When ordered to put his hands behind his back, he said, "I'm trying." A customer shouted, "He's not resisting!"

44. The Detective Defendants cursed at Plaintiff and told the customers who were filming and calling for an ambulance to "shut up." They refused to let the customer who was recording leave the store. When she asked for their names and badge numbers, one detective, upon information and belief Maden, answered, "My name is shut up. I'm trying to make a call right now."

45. At no time did Plaintiff strike, threaten or attempt to strike either Detective Defendant, attempt to flee, or possess or reach for a weapon. Plaintiff posed no threat to the Detective Defendants or anyone else. Plaintiff raised his arms only to shield his head and face from the blows, and any movement of his arms or legs on the floor was an involuntary reaction to the blows, to the weight of the Detective Defendants on his back and to the injury to his leg, not resistance.

46. Neither Detective Defendant made any effort to stop the other's use of force, although each had ample time and opportunity to do so over the course of several minutes.

47. Repeatedly during the encounter, Maden stepped away to the front door to type on and talk into his cellular telephone, leaving Algerio to kneel on Plaintiff alone. Upon information and belief, Maden was using the WhatsApp messaging application to summon backup because members of the team had not been issued or were not carrying police radios. One of the Detective Defendants shouted, "Where the fuck are these guys?"




**Figure 7 (0:57).** Maden types on his cellular telephone at the front door while Algerio kneels on Plaintiff alone.



**Figure 8 (4:20).** Plaintiff lies handcuffed and face down near a pool of his blood.

48. Neither Detective Defendant wore or activated a body-worn camera during the encounter, and neither carried a visible police radio. On April 20, 2026, the NYPD stated that the Detective Defendants were supposed to be wearing body-worn cameras and were not.

49. No other officer came to the Detective Defendants' aid for approximately seven minutes. The Detective Defendants then lifted Plaintiff from the floor and walked him out of the store in handcuffs.

50. Outside the store, one of the Detective Defendants, upon information and belief Maden, was recorded shouting, "And if these guys don't get a radio ASAP, I'm making a big fucking problem. I'm not doing this WhatsApp shit no more." In footage aired by FOX 5 New York, the same detective also shouted, "How are these fucking guys coming to work unprepared? No one does anything."

51. Upon information and belief, Sergeant Doe directed the apprehension team during the operation, including its decision to seize Plaintiff. He and Does 2 through 10 arrived at the scene during or after the use of force, took part in or approved Plaintiff's arrest and processing, and did nothing to stop or report the Detective Defendants' misconduct. No officer intervened at any point to stop the beating.

52. The Detective Defendants placed Plaintiff, handcuffed and bleeding, in the back of an NYPD detective van.

53. Plaintiff repeatedly asked for medical attention. One of the customers had called for an ambulance while Plaintiff was still pinned to the floor.

54. When FDNY Emergency Medical Services personnel arrived, the police at first did not tell them that Plaintiff was in the van. The EMS crew found Plaintiff handcuffed in the back of the detective van with facial trauma and a large laceration to his right knee that was bleeding uncontrollably, applied a pressure dressing, and transported him to the hospital.

**C. Plaintiff's Injuries**

55. Plaintiff arrived at the emergency department of NewYork-Presbyterian Brooklyn Methodist Hospital at approximately 4:30 p.m. and was treated there until approximately 10:40 p.m. Throughout his treatment he remained in NYPD custody, shackled at the ankles and handcuffed to the bed by his left wrist.

56. CT imaging showed that the Detective Defendants had broken Plaintiff's nose, causing a mildly displaced fracture of the right nasal bone and a fracture of the left nasal bone, and had caused a hematoma beneath his scalp on the right side of his head. His face was swollen and bruised, with swelling and bruising around his left eye.

57. The broken glass cut Plaintiff's legs, leaving six lacerations on his right knee totaling approximately eight centimeters, a two-centimeter laceration on his left knee, and a

laceration on his right thigh. Glass was embedded in his right knee. Physicians removed the glass, enlarged, irrigated and debrided the right-knee wound, and closed the knee lacerations with 25 sutures. The wounds have scarred Plaintiff's right leg.

58. Plaintiff also suffered injuries to his left arm, elbow, wrist and shoulder, for which his orthopedist referred him in July 2026 for a CT scan of the elbow and an MRI of the wrist, and post-traumatic low back pain that his treating spine physician attributes to the blunt trauma of the assault. In June 2026, CT imaging revealed healing fractures of Plaintiff's right eleventh and twelfth ribs, which upon information and belief were caused by the blows and kicks the Detective Defendants inflicted.

59. For months after the beating Plaintiff walked with a cane. His physicians directed him to continue using it, referred him for physical therapy and pain management, and anticipated that he would be unable to perform his normal work duties for a prolonged period because pain prevented him from standing or walking for long periods.

60. Plaintiff has suffered and continues to suffer severe emotional and psychological injury. Within two weeks of the beating, his primary care physician diagnosed him with an adjustment disorder with anxiety, documenting anxiety, fearfulness, nightmares, flashbacks and difficulty sleeping since the assault. In October 2026, a psychiatric nurse practitioner at The Brooklyn Hospital Center diagnosed him with post-traumatic stress disorder, documenting daily intrusive thoughts and flashbacks, hypervigilance in public, startle responses to loud noises, avoidance, depression, anxiety, anger and embarrassment arising from the assault, and referred him for trauma-focused psychotherapy.

61. Plaintiff worked his shift as a home health aide on April 14, 2026, and his injuries have prevented him from returning to work since. He has received only partial statutory disability

benefits in place of his wages. He has lost wages and earning capacity, and he has incurred and will continue to incur medical expenses.

**D. The False Charges**

62. Although Plaintiff had committed no offense, the Detective Defendants arrested him and caused him to be charged with resisting arrest, N.Y. Penal Law § 205.30, and obstructing governmental administration in the second degree, N.Y. Penal Law § 195.05.

63. Upon information and belief, the Detective Defendants prepared and signed arrest paperwork, and forwarded information to the Kings County District Attorney's Office, falsely stating that Plaintiff had resisted arrest and obstructed them, in order to justify their use of force and their seizure of an innocent man. Upon information and belief, Sergeant Doe reviewed and approved the arrest.

64. After Plaintiff was discharged from the hospital, NYPD members took him to the 84th Precinct, where he was fingerprinted, held for several more hours, and fingerprinted a second time. At approximately 2:00 a.m. on April 15, 2026, about ten hours after he was seized, Plaintiff was released with a Desk Appearance Ticket requiring him to appear in Kings County Criminal Court to answer the charges.

65. The NYPD determined that Plaintiff was not involved in the drug transaction, that he possessed no drugs or contraband, and that he was not the person the officers were seeking.

66. On or about April 15, 2026, the Kings County District Attorney's Office declined to prosecute the charges. The proceeding terminated without a conviction.

**E. The NYPD's Response**

67. On April 15, 2026, after video of the beating circulated publicly, Police Commissioner Jessica Tisch described the videos as deeply disturbing, announced that the NYPD

Internal Affairs Bureau was investigating, and placed the Detective Defendants on modified duty and removed their firearms and shields.

68. On April 15, 2026, a complaint concerning the Detective Defendants' conduct was filed on Plaintiff's behalf with the New York City Civilian Complaint Review Board ("CCRB"), which opened Case No. 202603533. The NYPD's Internal Affairs Bureau has interviewed Plaintiff and photographed his injuries.

69. Mayor Zohran Mamdani publicly described the violence shown in the video as extremely disturbing and unacceptable.

70. In the following days, the NYPD placed Sergeant Doe on modified duty and removed his supervisory duties. On or about April 17, 2026, the NYPD disbanded the Brooklyn North Narcotics module that conducted the operation and transferred six more of its detectives, as well as the lieutenant and captain who oversaw Brooklyn North narcotics operations, who upon information and belief were Reynolds and Casella.

71. On April 20 and 21, 2026, the NYPD announced a 90-day review of its narcotics enforcement led by the Chief of Department, covering policies, compliance, equipment and training. The NYPD stated that, as part of the review, narcotics commanders would have to account for their use of confidential informants, their tactical plans, and their handling of equipment and buy money; that it would clarify its policy to require body-worn cameras during drug operations; that commanding officers would regularly check in on narcotics units to ensure they meet department standards; and that its Legal Bureau would audit narcotics units for compliance with department policy.

72. On June 1, 2026, testifying before the City Council, Commissioner Tisch stated that the incident had raised serious concerns about supervision and about compliance and

adherence to Department procedures, that the NYPD had made sweeping personnel changes within narcotics as a result, and that the 90-day review covered the NYPD's policies, procedures, equipment, compliance systems and supervisory oversight. Upon information and belief, the City has not publicly disclosed the review's findings.

73. These measures were directed at conditions that existed before April 14, 2026: Brooklyn North Narcotics was operating without adequate supervision, without body-worn cameras, without adequate radios, and with officers who had documented histories of misconduct. According to a community leader who met with her on April 20, 2026, Commissioner Tisch said she would focus on the detective bureau and on compliance "so they will be able to make sure that they have body-worn cameras, making sure they have radios."

**F. Other Persons Seized in the Same Operation**

74. Plaintiff was not the only innocent person seized in the April 14, 2026 operation. Ronald Maxwell, who was ordering food at a store near Baltic and Hoyt Streets that day, was grabbed by NYPD members participating in the operation, told he was under arrest for attempted sale, pushed against a gate, handcuffed and taken to the 84th Precinct. He was then released without being fingerprinted, charged or brought before a judge. On April 15, 2026, the NYPD stated that it was investigating Mr. Maxwell's arrest. The NYPD has also stated that it has no arrest on file for him.

**G. The City Kept the Detective Defendants in Street Enforcement Despite Their Records**

75. Before April 14, 2026, the City and the NYPD knew that Maden had a long record of complaints of abusive conduct, including force.

76. From 2016 through 2021, civilians filed twelve complaints against Maden with the CCRB. Seven of those complaints alleged that he used physical force, including a 2021 complaint alleging a chokehold and restricted breathing.

77. The CCRB substantiated twelve allegations against Maden arising from five separate complaints:

(a) for an October 8, 2019 incident, two failures to provide a Right to Know Act business card, for which the CCRB recommended a command discipline and the NYPD decided not to impose any discipline;

(b) for a January 28, 2020 incident, discourteous language, for which the NYPD imposed a command discipline;

(c) for a May 27, 2020 incident, an unlawful frisk, a threat of arrest, two unlawful vehicle searches, discourteous language and offensive language, for which the CCRB recommended formal disciplinary charges; the NYPD never served the charges on Maden, and in July 2023 the case was closed without discipline because the time to commence a disciplinary proceeding had expired;

(d) for a December 3, 2020 incident, a failure to provide a Right to Know Act business card, for which the CCRB recommended a command discipline and the NYPD records show no disposition or penalty; and

(e) for an October 5, 2021 incident, an abuse of authority and an unlawful summons, for which Maden was found guilty in an NYPD disciplinary proceeding and forfeited thirteen vacation days.

78. Maden has also been named as a defendant in civil rights lawsuits arising from his police work, including Nieves v. City of New York, No. 1:19-cv-00716 (E.D.N.Y.), which alleged

that Maden and other officers forced their way into the plaintiff's apartment and punched and kicked him, and which was settled; Best v. City of New York, Index No. 519607/2021 (Sup. Ct. Kings Cnty.), which alleged an unlawful vehicle stop and search and an arrest on charges later dismissed, and which was settled; and Morgan v. City of New York, Index No. 530584/2023 (Sup. Ct. Kings Cnty.), which alleged that Maden and other officers used a Taser on and kicked the plaintiff during a 2021 stop. A CCRB force complaint against Maden arising from a May 27, 2017 incident was closed because litigation was pending.

79. Before April 14, 2026, the City and the NYPD likewise knew that Algerio had a record of complaints and lawsuits involving force. CCRB records show eight complaints against Algerio arising from incidents between July 2013 and May 2025, four of which alleged physical force, including a complaint that, upon information and belief, the CCRB received in early 2026 alleging that Algerio used physical force during a May 8, 2025 incident. The CCRB substantiated an abuse-of-authority allegation against him arising from a November 2018 incident, which resulted only in formalized training.

80. Algerio has been named as a defendant in civil rights lawsuits including Liu v. City of New York, No. 1:14-cv-06951 (S.D.N.Y.), which alleged that he and another officer grabbed, pushed and stepped on a street vendor, and which was settled; and Hansley v. City of New York, Index No. 159126/2017 (Sup. Ct. N.Y. Cnty.), which alleged excessive force, false arrest and malicious prosecution, and which ended in 2025 with a $20,090 payment to the plaintiff.

81. The Detective Defendants' CCRB histories also include earlier complaints about the same kinds of conduct they engaged in on April 14, 2026. Civilians complained that Maden failed to provide a Right to Know Act business card in three separate encounters in October 2019 and December 2020, refused to give his name and shield number in January 2020, interfered with

a civilian's recording in October 2019, and threatened civilians with force or arrest in January and May 2020. Civilians complained that Algerio refused to give his name and shield number in November 2017, failed to provide a Right to Know Act business card in August 2020, and threatened civilians with arrest or force in 2017, 2018, January 2020 and July 2024. Whether or not the CCRB substantiated them, these complaints put the City on notice that both detectives had been accused, again and again, of refusing to identify themselves and threatening the civilians they encountered. Upon information and belief, the NYPD receives notice of every CCRB complaint filed against its members.

82. The NYPD receives the CCRB's findings and recommendations and decides what discipline to impose, and the City's Law Department defends civil lawsuits against NYPD members, of which the NYPD is notified. The City therefore knew of the Detective Defendants' complaint, disciplinary and litigation histories.

83. Despite that knowledge, the City kept both Detective Defendants armed and assigned to plainclothes narcotics enforcement, in which they routinely seized civilians on the street. Upon information and belief, the City did not place either detective in any meaningful monitoring, retraining, reassignment or early-intervention program, and did not impose discipline sufficient to deter further misconduct.

**H. The Supervisory Defendants' Personal Involvement**

84. Upon information and belief, Reynolds and Casella approved the tactical plan for the April 14, 2026 operation and assigned the Detective Defendants to its apprehension team with knowledge of their complaint and disciplinary histories.

85. Upon information and belief, Reynolds and Casella knew that members of their command routinely conducted enforcement operations without wearing or activating body-worn cameras, without police radios, and by communicating through cellular telephones and the

WhatsApp application, and they permitted these practices to continue. The statement of one Detective Defendant immediately after the arrest, complaining that officers came to work without radios, that he would no longer use WhatsApp, and that no one did anything about it, reflects a known and longstanding condition in the command.

86. Reynolds's own record reflects the same indifference to recording requirements. According to CCRB records, the CCRB substantiated an allegation that Reynolds improperly used his body-worn camera during a July 2023 incident and recommended a command discipline. The NYPD decided not to impose any discipline.

87. The Supervisory Defendants' CCRB histories show the same patterns. Civilians filed sixteen CCRB complaints against Reynolds between 2006 and 2023, five of which alleged physical force, three of which alleged that he refused to give his name and shield number, and one of which alleged that he refused to obtain medical treatment for a civilian. Civilians filed eight CCRB complaints against Casella between 2008 and 2023, two of which alleged physical force and two of which alleged that he refused to give his name and shield number.

88. Upon information and belief, Reynolds and Casella did not require confirmation of a suspect's identity by the undercover officer, or any comparable safeguard, before apprehension teams seized people based on generic clothing descriptions, and they knew that this practice was causing the seizure of innocent people, as it did to Plaintiff and Mr. Maxwell on the same day.

89. Reynolds and Casella were themselves the subject of repeated civil rights lawsuits before April 14, 2026. Upon information and belief, Reynolds has been named in at least fourteen such lawsuits, including Eley v. City of New York, No. 1:14-cv-02525 (E.D.N.Y.), which alleged that he falsely reported observing cocaine in plain view, and Casella has been named in at least seven federal civil rights lawsuits, including Collins v. City of New York, No. 1:14-cv-01648

(E.D.N.Y.), and Aguirre v. City of New York, No. 1:15-cv-06043 (E.D.N.Y.), which alleged false arrests. Upon information and belief, the City paid at least $337,000 to resolve lawsuits naming Reynolds and at least $119,000 to resolve lawsuits naming Casella. The City nonetheless placed them in command of narcotics enforcement in Brooklyn North.

90. Upon information and belief, Sergeant Doe was the field supervisor for the apprehension team. He was responsible for directing the team, ensuring that its members wore and activated body-worn cameras and carried radios, and reviewing and approving arrests. He failed to do so, approved Plaintiff's arrest and the false charges despite knowing that Plaintiff was not the person sought and had been beaten, and did not report the Detective Defendants' use of force.

91. Upon information and belief, Reynolds and Casella received notice of the CCRB complaints, substantiated allegations and lawsuits against Maden and Algerio through the NYPD's personnel and command notification systems, and nonetheless assigned both detectives to plainclothes street enforcement in April 2026.

**I. The City's Policies, Customs and Practices**

92. Under N.Y.C. Charter § 434(a), the Police Commissioner has cognizance and control of the government, administration, disposition and discipline of the NYPD, and is the City's final policymaker for the NYPD's training, supervision, equipment and discipline. The violations of Plaintiff's rights described above were caused by the following policies, customs and practices of the City, each of which the City maintained with deliberate indifference to the constitutional rights of the people its officers encounter.

***1. The City fails to discipline officers whose misconduct the CCRB substantiates.***

93. The City has long allowed officers who commit substantiated misconduct to escape meaningful discipline, and its officers know it.

94. In an audit issued December 30, 2025 (Audit No. FK25PAR20005), the New York City Comptroller found that, of 1,929 substantiated cases the CCRB referred to the NYPD without formal charges between January 2024 and May 2025, the NYPD did not implement the CCRB's disciplinary recommendations in 1,040, or 53.9 percent. The NYPD closed 993 of those cases without any review under a policy, in effect from February 2023 through February 2025, of refusing to review cases received with fewer than 60 days remaining before the limitations period expired. In cases where the CCRB brought formal charges, the NYPD failed to serve the charges in 86 of 627 cases.

95. The CCRB's 2025 Annual Report reported that the Police Commissioner's agreement with the CCRB's disciplinary recommendations fell to 30 percent in 2024, a record low, and that the NYPD dismissed 890 substantiated cases in 2024 as too close to the eighteen-month limitations period to proceed.

96. These failures are longstanding. In 2022, the Police Commissioner departed from or overrode CCRB disciplinary recommendations in at least 425 complaints, according to City data obtained by The Legal Aid Society.

97. The City's own data confirm the practice. According to the CCRB's 2022 Annual Report, the Police Commissioner's agreement with the CCRB's disciplinary recommendations fell from 86 percent in 2020 to 43 percent in 2022, and the NYPD closed 343 substantiated cases in 2022 without discipline as too close to the limitations period. According to the Mayor's Management Report, the NYPD disciplined only 54, 47, 55 and 53 percent of officers against whom the CCRB substantiated allegations in Fiscal Years 2022 through 2025, respectively, and in each of those years it returned more decisions rejecting the CCRB's recommendations than accepting them. In September 2024, the New York State Comptroller found that, since January

2023, the NYPD had declined to pursue discipline in 480 decisions as too close to the limitations period.

98. The City has been on notice of this failure for more than a decade. In 2013, after a nine-week trial, the United States District Court for the Southern District of New York found that, when confronted with evidence of unconstitutional stops, the NYPD "refuses to impose meaningful discipline, and fails to effectively monitor the responsible officers for future misconduct," that from 2007 through 2011 the NYPD "declined to pursue discipline in between 16% and 36% of the substantiated complaints forwarded by the CCRB," and that "the NYPD consistently downgrades the discipline recommended by the CCRB." Floyd v. City of New York, 959 F. Supp. 2d 540, 617-19 (S.D.N.Y. 2013). In October 2015, the Inspector General for the NYPD reported that "[h]istorically, NYPD has frequently failed to discipline officers who use force without justification," and found that the NYPD had imposed no discipline for 35.6 percent of the substantiated allegations in which the Inspector General confirmed that officers had used excessive force. In July 2020, the New York State Attorney General reported that, although the CCRB had recommended discipline for nearly 2,500 officers from 2014 through 2018, including more than 600 for suspension or termination, "not once in those five years did the NYPD Commissioner fire an officer following CCRB's recommendation."

99. Maden's own record reflects this practice. In the May 27, 2020 matter described above, the CCRB substantiated six allegations and brought formal charges, but the charges were never served and Maden received no discipline. In two other matters, arising from incidents on October 8, 2019 and December 3, 2020, the CCRB substantiated three allegations that Maden failed to provide the business card that the City's Right to Know Act, N.Y.C. Admin. Code § 14-174, requires officers to offer, and the NYPD imposed no penalty in the 2019 matter and recorded

no disposition or penalty in the 2020 matter. The NYPD's own Disciplinary System Penalty Guidelines treat an officer's failure or refusal to provide his name, shield number or Right to Know Act business card as misconduct. On April 14, 2026, when a customer asked for his name during Plaintiff's arrest, Maden, upon information and belief, answered, "My name is shut up."

100. The City has also chosen to stop investigating much of this conduct. After the City's Office of Management and Budget announced citywide budget cuts on September 9, 2023, the CCRB announced that it was no longer able to fully investigate certain cases and that, effective January 1, 2024, it had suspended investigating complaints limited to allegations such as failing to provide a Right to Know Act business card, refusing to provide a name or shield number, discourteous words or actions, threats without action and untruthful statements, until the City allocated sufficient funding. According to the CCRB, it closed 22.5 percent of all complaints in 2024 without investigation. A July 2024 complaint alleging that Algerio threatened a civilian with arrest was closed without investigation under the budget directive. Upon information and belief, the suspension remained in effect on April 14, 2026. The City thus stopped examining the very conduct that Maden, Algerio, Reynolds and Casella had each been accused of before April 14, 2026, refusing to identify themselves and threatening civilians, and that Maden displayed on April 14, 2026 when he answered a request for his name, "My name is shut up."

***2. The City fails to identify and intervene with officers who accumulate complaints, lawsuits and force allegations.***

101. The NYPD's early intervention program does not identify or correct officers with histories like Maden's and Algerio's. The court-appointed monitor in Floyd v. City of New York, No. 08-cv-1034 (S.D.N.Y.), reported in October 2025 that the program had not been effective, citing an officer with nine CCRB complaints in a single year who received no intervention, and

reported in February 2026 that the program remained insufficient and that officers with multiple CCRB complaints were not flagged early.

102. The NYPD's own report on its early intervention program for calendar year 2025 shows that no intervention was recommended for 57 percent of the 447 officers identified as candidates, and that no review was triggered by a lawsuit judgment or settlement or by a use of force.

103. The City has known for more than a decade that the NYPD does not use lawsuits to identify problem officers. In April 2015, the Inspector General for the NYPD reported that the City had "no effective method" of combining its data on claims and lawsuits against NYPD members and that the NYPD "was often unaware of the ultimate settlement or resolution of pre-litigation claims." In April 2019, the Inspector General reported that the NYPD "had previously decided not to include lawsuit data in its early intervention system," that it had since decided to do so, and that its alert system set no deadline for supervisors to act on an alert. The NYPD's report for 2025 shows that a lawsuit judgment or settlement triggers early intervention review only when the suit alleges an unconstitutional stop or trespass enforcement, so that judgments and settlements in suits alleging excessive force or false arrest, like those against Maden and Algerio, trigger no review at all, and that in 2025 no review was triggered by any lawsuit judgment or settlement.

104. In a September 22, 2025, report titled A Blueprint for Department-Wide Restraint, the Comptroller found that excessive force incidents investigated by the CCRB "jumped by 49% between 2022 and 2023, to the highest number since 2013," and that the NYPD's early intervention systems are not designed to detect "broader department-wide and precinct-level patterns in complaints or settlements." The Comptroller also found that the 75th and 73rd Precincts, which

upon information and belief lie within Patrol Borough Brooklyn North, were among the four precincts with the most CCRB force complaints from 2022 through 2024.

105. Reports that the Floyd monitor filed after April 14, 2026, covering the NYPD's conduct during 2025, confirm that these supervisory failures existed before Plaintiff was beaten. The monitor found that "[e]ffective supervisor review of stops remains poor," that "NYPD supervisors repeatedly failed to identify unlawful stops, frisks, and searches," and that the compliance of the NYPD's specialized proactive enforcement units "has been significantly worse than patrol officers' constitutional compliance." The monitor also found that nearly 10,000 stops in 2025 were never documented, that officers who fail to document stops "are rarely disciplined," and that "[b]ecause undocumented stops evade supervisory review and judicial oversight, constitutional violations may go undetected."

106. The City therefore had no functioning mechanism to act on what it knew about the Detective Defendants: twelve CCRB complaints against Maden, seven alleging force, and civil lawsuits against both detectives alleging force and false arrest. Nine of Maden's complaints arose from incidents between May 2019 and December 2020, five of them in 2019 alone, the kind of concentrated complaint history the Floyd monitor found the program failed to flag. Upon information and belief, the NYPD never placed Maden in early intervention or otherwise intervened. The City's indifference left both detectives armed and assigned to street narcotics enforcement.

***3. The City fails to enforce its body-worn camera requirements.***

107. NYPD Patrol Guide Procedure 212-123 requires members issued body-worn cameras to activate them before engaging in arrests, uses of force and encounters with people suspected of crimes; provides that the camera will normally be worn on the outermost garment, including clothing worn for a plainclothes assignment; and requires that any failure to record be

reported to and investigated by a supervisor. The NYPD's published Body-Worn Camera Impact and Use Policy, updated February 4, 2026, likewise states that "[a]ll uniformed members of the service below the rank of Deputy Inspector" are equipped with body-worn cameras and that "[o]fficers must activate their BWC prior to engaging in police action," and it provides that the NYPD's body-worn camera unit informs commands when an incident that required recording was not recorded. The policy contains no exception for narcotics apprehension teams or plainclothes detectives. On March 17, 2026, four weeks before Plaintiff was beaten, the City publicly reaffirmed that officers must activate their cameras before taking police action.

108. The City does not enforce these requirements. In an audit issued October 31, 2025 (Audit No. MD24-071S), the Comptroller found that 18 percent of the body-worn camera videos reviewed were activated late or ended early, that supervisors' required self-inspections were missing for many of the months reviewed, and that the NYPD conducts no independent review of activation rates. The Floyd monitor has likewise reported late activations and early deactivations, and in January 2026 reported that it could not accurately estimate how many stops occurred without the required recording. Upon information and belief, the NYPD does not meaningfully investigate or discipline officers who fail to wear or activate their cameras, and before April 14, 2026 it did not audit narcotics units for camera compliance.

109. The City has known since at least February 2020 that its officers fail to record their encounters and that the absence of footage defeats accountability. That month, the CCRB reported that officers "often failed to properly use their cameras by turning on the BWC late," "turning the BWC off early, or not turning the BWC on at all," and that in 377 complaints the NYPD had told the CCRB that no footage existed when it did. The CCRB substantiated misconduct in 31 percent

of the complaints in which camera footage existed, compared with 13 percent of the complaints with no video.

110. The City has known since at least 2021 that its narcotics units lacked body-worn cameras and clear rules and training for their use. In February 2021, the NYPD met with the Detectives' Endowment Association, the union that represents NYPD detectives, about the rollout of body-worn cameras to Manhattan North Narcotics, and the union then collected detectives' safety objections to the issuance of cameras to the Narcotics Division. In August 2023, the union reported that the NYPD was fitting detectives with body-worn cameras "with little or no training on operating the camera," and that a training program for plainclothes detectives was still being developed. Upon information and belief, by April 14, 2026, the City still had not ensured that Brooklyn North Narcotics apprehension teams were equipped with, trained on and required to wear and activate body-worn cameras.

111. On April 20, 2026, the NYPD stated that the Detective Defendants were supposed to be wearing body-worn cameras and were not, and that its review would include its policies on activating body-worn cameras during apprehensions and increased oversight of narcotics operations. The New York Daily News reported that the NYPD's ongoing review had determined that the Narcotics Division's camera policy was not clearly codified, and that the NYPD would make clear that any officer involved in arresting a drug suspect must wear and activate a camera. On April 21, 2026, Mayor Mamdani stated that the review "includes stricter oversight of body-worn camera requirements during arrests." Either the City maintained a mandatory requirement that it knowingly failed to enforce in its narcotics units, or it knowingly left narcotics apprehension teams, which routinely seize civilians on the street, outside any clear recording requirement. Either way, the City's choice was a moving force behind the unrecorded beating of Plaintiff.

***4. The City fails to equip narcotics teams with radios and tolerates the use of cellular telephones and messaging applications in place of radios.***

112. The NYPD has instructed its members since at least 2013, citing officer safety, that cellular telephones are not a substitute for department radios. Department radios allow other members to hear where plainclothes officers are and what assistance they need, and they create a record of police communications. The City has also recognized that its employees conduct official business through WhatsApp and similar messaging applications on personal devices. A policy of its Department of Records and Information Services, effective May 2, 2025, identifies WhatsApp as an instant messaging system, treats messages concerning official City business as municipal records, and states that employees are "strongly discouraged" from creating instant messages that are substantive in nature. Upon information and belief, the NYPD did not capture or retain the WhatsApp messages that Brooklyn North Narcotics used to coordinate its operations, including the April 14, 2026 operation.

113. Despite this, the Brooklyn North Narcotics team that seized Plaintiff operated without police radios and coordinated its arrests through WhatsApp on cellular telephones, and upon information and belief other teams in the command did the same. The Detective Defendants could not summon or coordinate assistance by radio, prolonging a violent struggle that the Detective Defendants had created, and their communications about the operation and arrest were placed outside the NYPD's records systems. One Detective Defendant's statement after the arrest that he was done with WhatsApp and that no one did anything about the lack of radios shows that the condition was known and persistent. The NYPD's 90-day review expressly included equipment, and FOX 5 New York reported that the review would cover the use of WhatsApp. After the incident, according to The New York Times, a member of the City Council referred the matter to the City's Department of Investigation and asked it to examine the NYPD's

communication practices for instances of unauthorized text and phone communication, and the NYPD said that its 90-day review would aim to address and reform the kind of policy violations the Council Member and others had raised.

***5. The City tolerates a persistent pattern of unlawful seizures, fabricated charges and excessive force by narcotics units, including Brooklyn North Narcotics.***

114. The City has been on notice for well over a decade that its Brooklyn narcotics units seize people without probable cause, fabricate charges and use excessive force, and that productivity pressure drives this conduct.

115. In 2011, a former NYPD detective testified in Kings County Supreme Court that officers planted drugs on innocent people, a practice known as "flaking," to meet arrest quotas. That year, former Brooklyn South Narcotics officer Jason Arbeeny was convicted of official misconduct for planting drugs. In September 2022, the Kings County District Attorney moved to dismiss 378 convictions that relied on thirteen officers, including Arbeeny and former Brooklyn South Narcotics officer Jerry Bowens, whose cases accounted for 134 of the dismissals. In April 2021, the Kings County District Attorney moved to dismiss 90 convictions that relied on former narcotics detective Joseph Franco, who had been indicted in New York County for perjury.

116. Brooklyn North Narcotics in particular has been sued repeatedly for conduct like the conduct here, including seizing people as participants in drug sales on the basis of proximity or a generic description, beating people during arrests, and bringing charges that were later dismissed. Examples include: Sterling v. City of New York, No. 1:16-cv-00127 (E.D.N.Y.) (Brooklyn North Narcotics officers allegedly threw plaintiff into a wall and pressed an arm against his neck, obstructing his breathing, found nothing, and an undercover then claimed he had sold heroin); Covington v. City of New York, No. 1:14-cv-01856 (E.D.N.Y.) (plaintiff arrested because an undercover claimed he touched hands with a seller; no contraband; the court granted plaintiff

summary judgment on false arrest, and the case resolved by a $15,001 offer of judgment); Campbell v. City of New York, No. 1:15-cv-04984 (E.D.N.Y.) (plaintiff arrested for a sale minutes after arriving on the block; no drugs or buy money; charges dismissed); Washington v. City of New York, No. 1:21-cv-00156 (S.D.N.Y.) (undercover identified plaintiff as a seller although six recordings showed a different man; settled); Kleinfeldt v. City of New York, No. 1:17-cv-04323 (E.D.N.Y.) (jury verdict for plaintiff on excessive force and malicious prosecution against a detective and an undercover officer who, upon information and belief, were assigned to Brooklyn North Narcotics, after a buy-and-bust in which video showed the detective punching plaintiff while his hands were raised); Cayemittes v. City of New York, No. 1:15-cv-02364 (E.D.N.Y.) (plaintiff punched in the face during a stop by Brooklyn North Narcotics officers, suffering two orbital fractures; settled); Jones v. City of New York, No. 1:15-cv-03818 (E.D.N.Y.) (all seven people detained at a home, four outside and three inside, charged with possessing the same crack cocaine after a violent raid; charges dismissed; settled); Maldon v. City of New York, No. 1:18-cv-06521 (E.D.N.Y.) (Brooklyn North Narcotics officers arrested plaintiff for selling crack cocaine as he left a store; no drugs or prerecorded buy money were found on him; charges dismissed; settled); Gowins v. City of New York, No. 1:18-cv-01830 (E.D.N.Y.) (a Brooklyn North Narcotics undercover officer and two detectives searched plaintiff on the street, found nothing, and charged her with drug sale, drug possession and resisting arrest; charges dismissed); Taylor v. City of New York, No. 1:18-cv-05710 (E.D.N.Y.) (Brooklyn North Narcotics detectives arrested plaintiffs at a social club although no drugs were found on them, and a detective then reported to prosecutors that drugs had been observed nearby; charges declined or dismissed; settled); Joseph v. City of New York, No. 1:19-cv-05565 (E.D.N.Y.) (officers who, upon information and belief, were assigned to Brooklyn North Narcotics claimed that a box of baking soda contained narcotics and

arrested five members of a family, including a minor; all charges dismissed; settled); Daniels v. City of New York, No. 1:16-cv-00190 (E.D.N.Y.) (Brooklyn North Narcotics detectives executed a search warrant obtained on the strength of claimed controlled buys, in one of which the NYPD laboratory later found no controlled substance, and arrested plaintiffs; the court allowed a malicious prosecution claim against a detective to proceed to trial; settled); and Smith v. Famiano, No. 1:17-cv-06535 (E.D.N.Y.) (the court denied summary judgment to two Brooklyn North Narcotics officers, one of whom swore, to obtain a search warrant, that he followed a blood trail through plaintiff's open door and saw marijuana in plain view, facts plaintiff disputed, and the other of whom allegedly joined in the false affidavit; the resulting indictment was dismissed).

117. A May 2019 Brooklyn Eagle report on a Legal Aid Society study of federal lawsuits filed from January 2015 through June 2018 identified three Brooklyn officers among the five frequently sued officers the study highlighted, two of whom were Brooklyn North Narcotics detectives. The NYPD promoted one of them in 2018. Upon information and belief, CCRB data compiled and published by ProPublica show that, as of July 2020, at least 85 officers serving in Brooklyn North Narcotics had been the subject of at least 275 civilian complaints, comprising at least 746 allegations, that the CCRB fully investigated. Upon information and belief, in April 2018 the NYPD assigned to Brooklyn North Narcotics an officer who was then a defendant in Benbow v. Feely, No. 1:17-cv-06457 (E.D.N.Y.), a civil rights action alleging that he and another officer shot the plaintiff twice in the back in 2015. In November 2025, a federal jury found both officers liable for excessive force and awarded the plaintiff $190,000.

118. The same practices pervade the City's other narcotics units. In Brathwaite v. City of New York, No. 1:19-cv-09235 (S.D.N.Y.), Manhattan South Narcotics Division officers arrested a man less than a minute after he sat down in Washington Square Park, on an undercover

officer's identification following a buy-and-bust; the court denied the undercover officer and the City summary judgment on false arrest and malicious prosecution, and the case settled before trial. In Williams v. City of New York, No. 1:23-cv-01670 (S.D.N.Y.), plainclothes Bronx Narcotics Unit officers punched, kicked and stomped on a 58-year-old man after an undercover officer asked him to sell drugs and he did not, and then charged him with selling drugs; the charges were dismissed, and the City paid $120,000.

119. The City has also known since at least 2012 that its street narcotics teams are deployed without adequate training and supervision. In February 2012, after a member of a Bronx street narcotics team fatally shot Ramarley Graham, an unarmed eighteen-year-old, the Police Commissioner ordered a citywide audit of all street-level narcotics teams; the NYPD acknowledged that the officer had received neither street narcotics enforcement training nor plainclothes training before his assignment. Officers and supervisors told WNYC that it had been common practice for years to assign officers to plainclothes teams before they received proper training. The Commissioner then ordered a top-to-bottom review of street-level narcotics procedures. Upon information and belief, the City has never made that review public, and the NYPD rejected a Freedom of Information Law request for it filed in 2017. Fourteen years later, after Plaintiff was beaten, the City announced another review of the same subjects.

120. In the years before April 14, 2026, the City sharply expanded street narcotics enforcement. According to the Mayor's Management Report, NYPD narcotics arrests rose from 10,172 in Fiscal Year 2022 to 21,306 in Fiscal Year 2025, more than doubling, while use-of-force incidents by NYPD members rose from 9,189 to 14,561. Before Plaintiff was beaten, the City Council's Finance Division reported that narcotics arrests had increased 60.5 percent from Fiscal Year 2023 to Fiscal Year 2025, and by a further 14.7 percent in the first four months of Fiscal Year

2026. Upon information and belief, the City did not increase the supervision, equipment, body-worn camera enforcement or training of its narcotics units to match that expansion.

121. Upon information and belief, the NYPD also permits officers to void or "avoid" the arrests of people they seize in error, releasing them without any arrest record, as occurred with Mr. Maxwell on April 14, 2026. This practice conceals mistaken seizures from supervisors, prosecutors and oversight bodies and has allowed the practice of seizing people on generic descriptions to continue unchecked. Like the undocumented stops described by the Floyd monitor, these unrecorded seizures evade supervisory and judicial review. Upon information and belief, the NYPD permits narcotics apprehension teams to seize, and to use force against, a person on the strength of a clothing description relayed from an undercover officer before any confirmatory identification, and it provides no training or standard on what a generic description can justify.

***6. The City knows that plainclothes street enforcement units present heightened risks and fails to supervise them.***

122. On June 15, 2020, Police Commissioner Dermot Shea disbanded the NYPD's plainclothes anti-crime units, acknowledging that plainclothes street units generated "a disproportionate number of complaints and shootings." In January 2022, the NYPD's Chief of Department cited "concerns about proactive policing by Precinct-based plainclothes teams." The City nonetheless continued to deploy plainclothes narcotics apprehension teams to seize civilians on the street, including the Brooklyn North Narcotics team that seized Plaintiff, and upon information and belief adopted no comparable safeguards for them in supervision, identification, body-worn cameras or radios.

123. The proactive street enforcement teams the NYPD created after 2020 continued the same practices, and the City knew it. In June 2023, the Floyd monitor reported that it had found 24 percent of the Neighborhood Safety Team stops it reviewed from 2022 unlawful, while the

teams' own supervisors had found none unlawful. In February 2025, the monitor reported that in 2023 Neighborhood Safety Team officers had a lawful basis for only 54 percent of their searches, that supervisors "found that almost all the stops were constitutional when they were not," and that there were "no real consequences for the failure to prepare a stop report." In September 2024, a court-ordered report on NYPD discipline found that discipline of supervisors for these failures was "close to non-existent" and that Police Commissioners had shown "an inordinate willingness to excuse illegal stops, frisks, and searches."

124. In November 2024, the Inspector General for the NYPD found that there were "no policies, procedures, or operations guides specifically applicable to" the NYPD's citywide Community Response Team, a specialized street enforcement unit, and that, although the unit's supervisors reviewed applicants' complaint histories, senior NYPD officials "did not identify any threshold requirements with respect to officer history for unit entry." Upon information and belief, the NYPD likewise imposes no complaint-history screening for assignment to Brooklyn North Narcotics apprehension teams, which is how Maden, with twelve CCRB complaints, and Algerio, with eight, came to be seizing civilians on the street on April 14, 2026, under the command of Reynolds and Casella, who had sixteen and eight CCRB complaints of their own.

***7. The City fails to enforce its prohibitions on force against restrained people.***

125. Since at least June 1, 2016, NYPD Patrol Guide Procedure 221-02 has directed members to "[a]void actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back," to position a restrained person to promote free breathing as soon as safety permits, and to report the force they use to a supervisor, and it provides that "[a]ll members of the service must intervene to stop another member of the service from using excessive force." Patrol Guide Procedure 221-01 prohibits officers from using any level of force on a handcuffed or otherwise restrained person except in narrow circumstances. Upon information and

belief, these provisions remained in force on April 14, 2026. The NYPD's Disciplinary System Penalty Guidelines, effective September 9, 2024, treat restraining a person by sitting, standing or kneeling on the person's chest or back as misconduct that, where it causes physical injury, carries a presumptive penalty of thirty suspension days, thirty penalty days and dismissal probation.

126. Since July 15, 2020, N.Y.C. Admin. Code § 10-181 has made it a misdemeanor for an officer effecting an arrest to restrain a person in a manner that restricts the flow of air or blood by "sitting, kneeling, or standing on the chest or back in a manner that compresses the diaphragm." The City defended that law against a challenge brought by police unions, and the New York Court of Appeals upheld it in November 2023. Police Benevolent Ass'n of the City of N.Y., Inc. v. City of New York, 40 N.Y.3d 417 (2023).

127. The City therefore knew that kneeling on the back of a person held face down is dangerous and prohibited. Upon information and belief, the City did not train, supervise or discipline Brooklyn North Narcotics detectives to comply with these prohibitions, and it routinely declines to discipline officers who use prohibited restraints. In January 2015, the Inspector General for the NYPD found that the Police Commissioner "routinely rejected CCRB's disciplinary recommendations in substantiated chokehold cases without explanation," imposing a lesser penalty or none at all. On April 14, 2026, Algerio knelt on Plaintiff's back for minutes while Plaintiff lay face down and straddled his head, Maden brought his foot down on and stood on Plaintiff's leg while he was held on the floor, and neither intervened to stop the other.

***8. The City tolerates resisting arrest and obstruction charges brought to justify unreported force.***

128. The City has known since at least February 2018 that its officers charge people with resisting arrest while concealing their own use of force. In a report issued February 6, 2018, the Inspector General for the NYPD reviewed all 847 arrests from September through November 2016

in which the arresting officer reported that no force was used but charged the arrestee with resisting arrest. In at least 30 percent of those arrests, the officers had separately filed reports admitting that they used force, and 580 of the 847 arrests had no force report at all. In 36.2 percent of the arrests in which officers acknowledged using force, no required force report was filed, and in 23 percent of the supervisory force investigations reviewed, the supervisor did not report interviewing the person on whom force was used. The Inspector General concluded that "officers are underreporting force on arrest reports" and recommended that the NYPD discipline officers who fail to report force.

129. These practices are longstanding. In 1994, the City's Mollen Commission found that police falsification was "probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns," that "motivations to falsify are often present in narcotics enforcement units, especially to justify unlawful searches or arrests," and that supervisors were "rarely, if ever, held accountable for the falsifications of their subordinates." In 2009, in a case arising from charges that the plaintiffs sold narcotics to an undercover officer, Judge Jack B. Weinstein observed that "[i]nformal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department." Colon v. City of New York, Nos. 09-CV-8, 09-CV-9, 2009 WL 4263362 (E.D.N.Y. Nov. 25, 2009). In 2013, the Floyd court relied on an officer's testimony that he had been told, "Just handcuff them. We'll make up the charge later." 959 F. Supp. 2d at 621.

130. Upon information and belief, the City has not implemented any effective mechanism to identify resisting arrest and obstruction charges brought to justify unreported or

excessive force, and it does not review such charges when, as here, the District Attorney declines to prosecute them. The Detective Defendants charged Plaintiff with resisting arrest and obstruction to justify the force they had used, and the District Attorney declined to prosecute.

***9. The City pays to resolve this misconduct rather than correct it.***

131. The City has paid hundreds of millions of dollars to resolve claims and lawsuits arising from NYPD misconduct. According to the Comptroller, the City paid $270.15 million in fiscal year 2023 and approximately $309.5 million in fiscal year 2024 to settle personal injury and property damage claims against the NYPD. According to City data compiled by The Legal Aid Society, the City paid more than $796 million from 2019 through 2025 to resolve 6,766 lawsuits alleging NYPD misconduct, including more than $117 million in 2025 alone.

132. The City's Law Department defends and resolves these lawsuits and the NYPD is notified of them, but the City has not used them to identify, retrain, reassign or discipline the officers and supervisors involved, as the NYPD's early intervention data confirm.

***10. The City's deliberate indifference caused Plaintiff's injuries.***

133. The need for better supervision, discipline, training, equipment and enforcement of recording requirements in the City's narcotics units was obvious. The City knew that narcotics apprehension teams would seize civilians on the street based on undercover descriptions, that mistaken identifications and wrongful force in that setting would deprive people of their constitutional rights, and that its officers had repeatedly done exactly that.

134. The City had notice of these deficiencies before April 14, 2026, through the CCRB findings, lawsuits and verdicts, judicial findings, audits, Inspector General and Attorney General reports, monitor reports, prosecutorial dismissals, union notices and its own 2012 audit of its street narcotics teams described above. The measures it took afterward, including disbanding the module,

transferring its supervisors, reviewing narcotics policy, compliance, equipment and training, auditing narcotics units and clarifying the camera requirement, were directed at those same pre-existing deficiencies, as the Police Commissioner acknowledged when she testified that the incident had raised serious concerns about supervision and compliance.

135. The policies, customs and practices described above were the moving force behind the violations of Plaintiff's rights. Had the City disciplined and monitored the Detective Defendants, enforced its camera requirements, equipped and supervised Brooklyn North Narcotics, required reliable identification before apprehension teams seized people, enforced its prohibitions on force against restrained people, and scrutinized resisting arrest charges brought to justify force, the Detective Defendants would not have been assigned to seize Plaintiff, would not have seized him on a generic clothing description, and would not have beaten him and falsely charged him.

## FEDERAL CLAIMS

## FIRST CLAIM FOR RELIEF

### Excessive Force in Violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983 (Against Maden and Algerio)

136. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

137. The Detective Defendants, acting under color of state law, used force against Plaintiff that was objectively unreasonable under the circumstances, including punching him repeatedly in the head, driving him headfirst into a glass display, dragging him through broken glass, bringing his foot down on and standing on his leg, kneeling on his back and straddling his head while he was held face down on the floor, kicking him, and, upon information and belief, punching him in the face after he was handcuffed.

138. Plaintiff was not suspected of any violent offense, posed no threat to the Detective Defendants or anyone else, did not actively resist, and did not attempt to flee.

139. The Detective Defendants thereby deprived Plaintiff of his right under the Fourth and Fourteenth Amendments to be free from unreasonable seizures, including the use of excessive force.

140. The Detective Defendants acted intentionally, maliciously and with reckless disregard for Plaintiff's rights.

141. As a direct and proximate result, Plaintiff suffered the injuries and damages described above.

## SECOND CLAIM FOR RELIEF

**False Arrest and Unlawful Seizure in Violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983**

**(Against Maden, Algerio, Sergeant Doe and Does 2 through 10)**

142. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

143. Defendants, acting under color of state law, intentionally seized, arrested and confined Plaintiff. Plaintiff was conscious of the confinement and did not consent to it.

144. Defendants lacked probable cause, and no reasonable officer could have believed they had probable cause, to seize or arrest Plaintiff. Their only basis was that Plaintiff's clothing fit a generic description of a white shirt and green shorts, given for a person other than Plaintiff, that fit any number of people in the neighborhood that afternoon. They had no information placing Plaintiff at the sale, never saw him with the seller, made no effort to confirm the identification with the undercover officer, ignored Plaintiff's statement that he had a security license in his pocket, and found no drugs, money or contraband on him.

145. The resisting arrest and obstruction charges could not supply probable cause. Plaintiff did not resist or obstruct, and those charges arose from, and were fabricated to justify, the unlawful seizure and beating itself.

146. Sergeant Doe and Does 2 through 10 participated in, approved or continued Plaintiff's arrest and detention after they knew or had reason to know that Plaintiff was not the person sought.

147. Defendants acted intentionally, maliciously and with reckless disregard for Plaintiff's rights.

148. As a direct and proximate result, Plaintiff suffered the injuries and damages described above, including the loss of his liberty.

## THIRD CLAIM FOR RELIEF

### Failure to Intervene in Violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983

### (Against Maden, Algerio, Sergeant Doe and Does 2 through 10)

149. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

150. Each Detective Defendant observed the other's use of excessive force against Plaintiff and had a realistic opportunity to intervene over the course of several minutes. Sergeant Doe and Does 2 through 10, to the extent they were present during the force, likewise had a realistic opportunity to intervene. Each Defendant named in this claim knew that Plaintiff was being arrested and detained without probable cause and had a realistic opportunity to prevent it.

151. Each failed to take reasonable steps to intervene, although a reasonable officer in his or her position would have known that Plaintiff's constitutional rights were being violated.

152. As a direct and proximate result, Plaintiff suffered the injuries and damages described above.

## FOURTH CLAIM FOR RELIEF

### Supervisory Liability in Violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983

### (Against Sergeant Doe, Reynolds and Casella)

153. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

154. Each Supervisory Defendant, through his own actions and inactions, personally caused the violations of Plaintiff's rights.

155. Sergeant Doe directly supervised the apprehension team in the field, directed or approved Plaintiff's seizure on a generic clothing description, approved Plaintiff's arrest and the resisting arrest and obstruction charges after he knew that Plaintiff was not the person sought and had been beaten, failed to ensure that the Detective Defendants wore and activated their body-worn cameras and carried radios, and failed to report or act on the Detective Defendants' use of force.

156. Reynolds and Casella approved the tactical plan for the operation, assigned the Detective Defendants to seize civilians knowing their histories of complaints and lawsuits involving force and false arrest, authorized apprehension teams to seize people on generic descriptions without confirmatory identification, and knowingly permitted their command to conduct enforcement without body-worn cameras and police radios and through messaging applications on cellular telephones in place of radios.

157. Each Supervisory Defendant acted with deliberate indifference to the substantial and known risk that these practices would result in unreasonable seizures and excessive force, and these practices caused Plaintiff's unlawful seizure, beating and false charges.

158. As a direct and proximate result, Plaintiff suffered the injuries and damages described above.

## FIFTH CLAIM FOR RELIEF

**Municipal Liability, 42 U.S.C. § 1983**
**(Against the City of New York)**

159. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

160. The City, through its final policymakers, maintained the policies, customs and practices described in paragraphs 92 through 135, including:

(a) failing to discipline officers whose misconduct the CCRB substantiates, including by declining or failing to impose recommended discipline, allowing charges to go unserved or to lapse, and cutting off investigation of complaints that officers refused to identify themselves or threatened civilians;

(b) failing to identify, monitor, retrain or reassign officers who accumulate CCRB complaints, force allegations and civil lawsuits, and continuing to assign such officers to plainclothes street enforcement;

(c) failing to enforce, or failing to extend to narcotics apprehension teams, the requirement that officers wear and activate body-worn cameras during arrests and uses of force;

(d) failing to equip narcotics apprehension teams with police radios and tolerating their use of cellular telephones and messaging applications in place of radios to conduct and coordinate arrests;

(e) failing to train and supervise narcotics apprehension teams in identifying suspects before seizing them, including by permitting seizures based on generic descriptions without confirmatory identification by the undercover officer;

(f) tolerating a persistent and widespread practice among narcotics units, including Brooklyn North Narcotics, of seizing people without probable cause, using excessive force and bringing unfounded charges, and of voiding or "avoiding" mistaken arrests so that they leave no record;

(g) resolving lawsuits arising from such conduct without using them to identify, correct or discipline the officers and supervisors involved;

(h) expanding street narcotics enforcement without increasing the supervision, training, equipment and oversight of narcotics units to match, and deploying plainclothes apprehension teams without safeguards commensurate with the known risks of plainclothes street enforcement;

(i) failing to train, supervise and discipline officers to comply with the City's own prohibitions on kneeling on the backs of people held face down and on using force against restrained people, and with the duty to intervene; and

(j) tolerating resisting arrest and obstruction charges brought to justify unreported or excessive force, and failing to require accurate reporting and supervisory review of force.

161. These policies, customs and practices were so persistent and widespread as to constitute the custom and usage of the City, and the City's final policymakers knew of them and acquiesced in them.

162. The City's failures to train, supervise, discipline and equip its officers amount to deliberate indifference to the constitutional rights of the people its officers encounter. The City knew to a moral certainty that its narcotics officers would confront situations in which they must identify suspects and decide whether and how much force to use; those situations present difficult choices that training, supervision and accountability would make less difficult; and the wrong choice by officers in those situations frequently causes the deprivation of constitutional rights. The City had repeated notice, through CCRB complaints and findings, civil lawsuits, verdicts and settlements, judicial findings, reports of the Comptroller, the Inspector General for the NYPD, the Attorney General and the Floyd monitor, its own 2012 audit of its street narcotics teams, and prosecutors' mass dismissals of narcotics cases, that its officers were making the wrong choices, and it failed to act.

163. These policies, customs and practices were the moving force behind the violations of Plaintiff's rights under the Fourth and Fourteenth Amendments described in the First through Fourth Claims for Relief.

164. As a direct and proximate result, Plaintiff suffered the injuries and damages described above.

**CITY AND STATE LAW CLAIMS**

165. Plaintiff has satisfied all conditions precedent to the claims set forth below, as alleged in paragraphs 12 through 16.

166. At all relevant times, the individual Defendants acted within the scope of their employment by the City, and the City is liable for their conduct under the doctrine of respondeat superior as to each state law claim below.

167. This action falls within one or more of the exceptions set forth in CPLR 1602.

168. Pursuant to CPLR 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiff's damages, including Plaintiff's non-economic loss, irrespective of CPLR 1601, because Defendants owed Plaintiff a non-delegable duty and because the City is vicariously liable for the acts and omissions of the individual Defendants.

169. Pursuant to CPLR 1602(5), Defendants are jointly and severally liable for all of Plaintiff's damages, including Plaintiff's non-economic loss, irrespective of CPLR 1601, because Plaintiff's claims require proof of intent.

170. Pursuant to CPLR 1602(7), Defendants are jointly and severally liable for all of Plaintiff's damages, including Plaintiff's non-economic loss, irrespective of CPLR 1601, because Defendants acted with reckless disregard for the safety of others.

171. Pursuant to CPLR 1602(11), Defendants are jointly and severally liable for all of Plaintiff's damages, including Plaintiff's non-economic loss, irrespective of CPLR 1601, because Defendants acted knowingly or intentionally, and in concert, to cause the acts or failures that proximately caused Plaintiff's injuries.

## SIXTH CLAIM FOR RELIEF

**Unreasonable Seizure and Excessive Force, N.Y.C. Admin. Code §§ 8-801 through 8-807**
**(Against All Defendants)**

172. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

173. Each individual Defendant is an employee of the NYPD and a "covered individual" within the meaning of N.Y.C. Admin. Code § 8-801.

174. Under N.Y.C. Admin. Code § 8-802, Plaintiff had the right to be secure in his person against unreasonable searches and seizures and against the use of excessive force.

175. The individual Defendants, under color of law, subjected Plaintiff, or caused him to be subjected, including through their failure to intervene, to the deprivation of those rights by seizing and arresting him without probable cause and using excessive force against him, in violation of N.Y.C. Admin. Code § 8-803(a).

176. Under N.Y.C. Admin. Code § 8-803(b), the City, as the employer of the individual Defendants, is liable based upon their conduct.

177. Under N.Y.C. Admin. Code § 8-804, qualified immunity and any substantially equivalent immunity are not a defense to this claim.

178. As a direct and proximate result, Plaintiff suffered the injuries and damages described above, and he is entitled under N.Y.C. Admin. Code § 8-805 to compensatory damages, punitive damages against the individual Defendants in the Court's discretion, and reasonable attorney's fees and costs.

## SEVENTH CLAIM FOR RELIEF

**Assault**
**(Against Maden, Algerio and the City of New York)**

179. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

180. The Detective Defendants intentionally placed Plaintiff in reasonable apprehension of imminent harmful and offensive bodily contact, without justification.

181. As a direct and proximate result, Plaintiff suffered the injuries and damages described above. The City is liable under the doctrine of respondeat superior.

## EIGHTH CLAIM FOR RELIEF

### Battery
### (Against Maden, Algerio and the City of New York)

182. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

183. The Detective Defendants intentionally made harmful and offensive bodily contact with Plaintiff, without his consent and without privilege, by punching, kicking, shoving, dragging, kneeling on and stepping on him and driving him into a glass display.

184. As a direct and proximate result, Plaintiff suffered the injuries and damages described above. The City is liable under the doctrine of respondeat superior.

## NINTH CLAIM FOR RELIEF

### False Arrest and False Imprisonment
### (Against Maden, Algerio, Sergeant Doe, Does 2 through 10 and the City of New York)

185. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

186. Defendants intentionally confined Plaintiff. Plaintiff was conscious of the confinement, did not consent to it, and the confinement was not privileged because Defendants lacked probable cause.

187. As a direct and proximate result, Plaintiff suffered the injuries and damages described above. The City is liable under the doctrine of respondeat superior.

## TENTH CLAIM FOR RELIEF

**Malicious Prosecution**

**(Against Maden, Algerio, Sergeant Doe and the City of New York)**

188. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth here.

189. Defendants commenced and caused the continuation of a criminal proceeding against Plaintiff by charging him with resisting arrest and obstructing governmental administration, issuing him a Desk Appearance Ticket, and forwarding false information to the Kings County District Attorney's Office.

190. Defendants lacked probable cause to believe that Plaintiff had committed any offense.

191. Defendants acted with actual malice, including to justify their unlawful seizure of Plaintiff and the force they used against him, and to shield themselves from discipline and liability.

192. The proceeding terminated in Plaintiff's favor when the District Attorney declined to prosecute.

193. As a direct and proximate result, Plaintiff suffered the injuries and damages described above. The City is liable under the doctrine of respondeat superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and award:

(a) compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

(b) punitive damages against the individual Defendants in an amount to be determined at trial;

(c) reasonable attorney's fees and costs under 42 U.S.C. § 1988 and N.Y.C. Admin. Code § 8-805;

(d) pre-judgment and post-judgment interest; and

(e) such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: November 10, 2026
New York, New York

THE COCHRAN FIRM

By: /s/ Derek S. Sells
Derek S. Sells, Esq.
Mina Q. Malik, Esq.
17 State Street, 14th Floor
New York, New York 10004
(212) 553-9215
dsells@cochranfirmny.com
mmalik@cochranfirmny.com
*Attorneys for Plaintiff Timothy L. Brown*